Patricia **GOLD**, Jo Ann Moses, Jack Quinn, Elmer Quinn, Nick Kalama, Ruth Beymer, Bernyce K. Courtney, Melvin Wewa Jr., Phyllis M. Ike, Julie Mitchell, Serena Boyd, Venus W. Strong, Fern Begay, Mary Ellen Torres, Caroline Torres, James Walsey Jr., Geraldine Jim, Naomi Winishut, Nola Heath Adams, Cassemera Rhoan, Elizabeth Rhoan, Clifford Courtney, Mavis Shaw, Gloria Keene, Viola Kalama, May Dean Calaia, Rosanna Williams, Ramona Greene, for themselves and in behalf of all others similarly situated, Plaintiffs,

v.

The **CONFEDERATED TRIBES OF the WARM SPRINGS INDIAN RESERVATION**, Cecil D. Andrus, Secretary of the Interior, Forrest J. Gerard, Designated Assistant Secretary of the Interior for Indian Affairs, Defendants.

Civ. 75–1097.

United States District Court, D. Oregon.

Aug. 6, 1979.

John C. Barrett, Legal Services Corporation of Iowa, Des Moines, Iowa, Richard Slottee, Northwestern Legal Clinic, Portland, Or., for plaintiffs.

Cleveland Cory, Davies, Biggs, Strayer, Stoel & Boley, Portland, Or., for Confederated Tribes.

Sidney I. Lezak, U.S. Atty., Laury Hennings, Asst. U.S. Atty., Portland, Or., for Cecil D. Andrus and Forrest J. Gerard.

## OPINION

SOLOMON, District Judge:

This action arises out of a dispute over a plan to distribute a $1,225,000 judgment the Indian Claims Commission (Commission) awarded to the Confederated Tribes of the Warm Springs Indian Reservation (Confederated Tribes). The proposed judgment provides for distribution among the members of the Confederated Tribes who had not received a prior distribution. The exclusion affects about 321 members.

Plaintiffs bring this action against the Secretary of the Interior, the Assistant Secretary for Indian Affairs (federal defendants), and the Confederated Tribes. Plaintiffs challenge the validity of the distribution plan and they seek equitable relief for all excluded members of the Confederated Tribes.

### Background

Before Oregon was settled, the Wasco Tribe and the Wayampum or Warm Springs Tribe (treaty tribes), lived along the Columbia River in Eastern Oregon. The Snake or Paiute Tribe also lived in this area. *See The Confederated Tribes of the Warm Springs Reservation v. United States*, 12 Ind.Cl.Comm. 664, 729–40 (1963), *vacated in part and remanded*, 177 Ct.Cl. 184, 197–205 (1966).

In 1855, the United States and the treaty tribes signed the Treaty with the Indians in Middle Oregon, 12 Stat. 963 (1859). The tribes exchanged their interests in land for, among other things, the Warm Springs Reservation and certain treaty rights.

Although the Paiutes did not sign this treaty, by 1868 they lived on the Warm Springs Reservation.

In 1938, the Wascos, Wayampums, and Paiutes on the reservation formed a single tribe, the Confederated Tribes of the Warm Springs Reservation of Oregon, and a business corporation.[1] Both organizations were authorized by the Indian Reorganization Act, 48 Stat. 984, 987–988, §§ 16–17 (1934), 25 U.S.C. §§ 476–477. All of the plaintiffs in this action are descendants of members of those tribes, and most of them are descendants of the Paiutes and at least one of the other tribes.

### Confederated Tribes' Claim

In 1951, the Confederated Tribes filed a claim against the United States with the Indian Claims Commission for additional compensation for land that was ceded to the government under the 1855 Treaty. Plaintiffs contend that the Confederated Tribes also claimed damages for other wrongs. In 1963, the Commission held that the Confederated Tribes was not a successor in interest of the treaty tribes but that it could sue the United States in a representative capacity on behalf of the Indians who signed the 1855 Treaty. 12 Ind.Cl.Comm. 664, 714–

---

1. In this opinion, the Confederated Tribes will sometimes be referred to as the "modern tribe" to distinguish it from the three original tribes.

715. The Court of Claims affirmed with the qualification that:

"To whose benefit any award might inure is not decided by any phrasing of the capacity to sue. How the award is to be paid and precisely who can participate in the award are questions, not for this court or the Commission, but for Congressional and administrative determination." 177 Ct.Cl. 184, 210.

The government offered to compromise this claim.

Under a provision of the Tribal Constitution which requires that important questions be decided by referendum, the Tribal Council scheduled a settlement referendum and held four informational meetings. Members received six mailings in the three months preceding the referendum. The Madras Pioneer, a newspaper published in Madras, Oregon (which is 15 miles from the town of Warm Springs), reported the settlement referendum on four occasions.

On September 18, 1973, the Confederated Tribes voted to accept the settlement offer, and on the following day the Tribal Council agreed to settle its claims under Section 2 of the Indian Claims Act, 25 U.S.C. § 70a, for $1,225,000.[2]

The Commission entered judgment for $1,225,000 on this settlement, and on January 3, 1974, Congress appropriated the money to satisfy it. 87 Stat. 1071, 1085.[3]

*Judgment Distribution Plan*

Under the Distribution of Judgment Funds Act, 25 U.S.C. §§ 1401–1407, the Secretary of the Interior (Secretary) is required to submit a proposed distribution plan to Congress within 180 days of an appropriation. This Act requires the Secretary to "prepare a plan which shall best serve the interests of all those entities and individuals entitled to receive funds of each Indian judgment." 25 U.S.C. § 1403(a). A regulation requires the Secretary to deter-

mine who shall share in a judgment. 25 C.F.R. § 60.3.[4] The Secretary is obligated to insure that related tribal enactments "are in full accord with the principles of fairness and equity," 25 U.S.C. § 1403(b)(4), and to insure that "the needs and desires of any groups or individuals who are in a minority position . . . are . . . considered." 25 U.S.C. § 1403(b)(2). The Secretary is also required to provide the tribe with the Department's expertise to help the tribe develop proposals, 25 U.S.C. § 1403(b)(1), 25 C.F.R. § 60.3(b), and is to consider plans submitted by the tribe, 25 U.S.C. § 1403(a)(1). The Secretary must program at least 20% of a tribe's funds for general tribal purposes unless he "determines that the particular circumstances of the pertinent Indian tribe clearly warrant otherwise." 25 U.S.C. § 1403(b)(5), 25 C.F.R. § 60.9.

Paul Weston, a Tribal Operations Officer from the Bureau of Indian Affairs (BIA), met with the Tribal Council of the Confederated Tribes (Council) on March 20, 1974. His advice was the only assistance the BIA gave the Confederated Tribes. He told the Council that it did not have time to wait for the BIA to prepare a research report, but that it must immediately choose a plan and schedule a public meeting. Weston did not do any research but he relied on his own experience with the tribe and on court decisions on this claim. Nevertheless, he now admits that he did not completely understand the decisions or the terms of the settlement and did not know if the settlement surrendered claims held by the Confederated Tribes. Weston says that this was the best his understaffed office could do because of the time constraints set by the Act and the many other plans then pending.

Weston assumed that the Commission finding that the Confederated Tribes _ _ that is, the modern tribe _ _ _ could

---

**2.** This settlement did not include claims asserted in a second action.

**3.** Under an agreement between the parties, the money has not been distributed.

**4.** The regulation provides that:

"The Secretary shall cause to begin as early as possible the necessary research to determine the identity of the ultimate or present day beneficiaries of judgments."

sue as a representative of the treaty tribes, in connection with the issue of capacity to sue, controlled the distribution of the judgment. He therefore told the Council that the judgment could not be distributed to every member of the Confederated Tribes or programmed for use by the Confederated Tribes.

At the meeting held March 20, 1974, the Council adopted Resolution 4074. This resolution proposed that the award be distributed to those members of the Confederated Tribes who had not received a distribution either from any other judgment or from the Alaskan Native Claims Settlement Act.[5] This provision is the basis of plaintiffs' complaint.

Weston knew the number of Confederated Tribes members who shared in the Malheur Paiute judgment but he did not know how many members shared in the other distributions or how many were descendants of both a member of the Paiute Tribe and a member of a treaty tribe. Later, after the judgment role was prepared, this information was compiled.

The Act requires the Secretary to "hold a hearing of record, after appropriate public notice," on each proposed distribution. 25 U.S.C. § 1403(a)(2). A regulation provides that "[t]he hearing shall be held after appropriate public notice beginning at least twenty (20) days prior to the date of such hearing." 25 C.F.R. § 60.4(b). The Secretary is also required to help the tribe hold preliminary informational meetings. 25 C.F.R. § 60.3(b).

On March 20, 1974, the Tribal Council scheduled an informational meeting for April 29, 1974, and a recorded public hearing for the following day.

Three newspapers carried notices of the April 30 meeting. Two, the Oregonian and the Oregon Journal, are published in Portland, about 104 miles from Warm Springs. The third, the Bend Bulletin, is published in Bend, about 59 miles from Warm Springs. These notices were first published on April 11. This was 19 days before the hearing

rather than the 20 days required by the regulation. The meetings were also mentioned in the Tribal Council Newsletter routinely mailed to each household on April 18. Notices were also posted at several places on the reservation. None of these announcements described the terms of the proposed plan.

Weston presided at both the informational hearing held April 29 and at the public hearing held April 30. He also solicited written comments. A transcript of the April 30 hearing and the written comments were included in the administrative record sent to the Secretary for the completion of his proposed distribution plan.

The Act requires the Secretary to submit his proposed distribution plan to Congress within 180 days after Congress appropriates the money to satisfy the judgment. The Secretary may request a 90 day extension, but if he cannot submit a proposed distribution plan within that extended time he is required to propose legislation for the distribution of the fund. 25 U.S.C. § 1402.

The Secretary did not request an extension but on October 10, 1974, he submitted as his plan the plan the Tribal Council had approved. This was more than 280 days after the money was appropriated.

The Act and the regulations require the Secretary to send Congress "a statement of the extent to which such plan reflects the desires of the Indian tribe or individuals who are entitled to such funds," with each plan. 25 U.S.C. § 1404(2); 25 C.F.R. § 60.5(c).

In his letter he said that:

"It has been at least an informal understanding, on the part of most of the members of the Confederated Tribes, that participation in the Malheur award would (or should) preclude the participants from sharing in any award for the Wasco and Wayanpum lands."

According to the Secretary, members of the Confederated Tribes understood that the 265 members who shared in the Malheur Paiute award would not share in the judgment.

5. 43 U.S.C. §§ 1601–1628.

Weston admits that most members of the Confederated Tribes did not share this understanding. He says most members understood that the 53 members of the Confederated Tribes who shared in the Malheur Paiute judgment, and who were not descended from a member of a treaty tribe, would not share in this judgment.

Weston's description of this understanding differs significantly from the understanding described to Congress. It may have been understood that the 53 descendents of members of the Paiute Tribe who were not descended from a member of the treaty tribes would not share in this judgment. But there was no understanding that the 212 plaintiffs who shared in the Malheur Paiute judgment who were also descended from a member of a treaty tribe would not share in this judgment.

The BIA notified two members of the Oregon Congressional delegation, Representatives AuCoin and Duncan, that "standard procedures were followed for notification of both the tribal council and hearings in this case."

The Act provides that a proposed distribution plan is to go into effect 60 days after it is submitted unless either House adopts a resolution disapproving the plan. 25 U.S.C. § 1405. No resolution disapproving the plan was introduced.

After the expiration of 60 days, the Secretary published the plan in the Federal Register. It provides for the equal payment of the judgment to all members of the tribe in February 1975 who:

". . . have not shared in the distribution of the judgment awarded to the Malheur Paiutes under the provisions of the Act of August 20, 1964 (78 Stat. 563), or have not received per capita payments from any other judgments of the Indian Claims Commission and have not received payments under the provisions of the Alaska Native Settlement Act of December 18, 1971 (85 Stat. 688)." 25 C.F.R. § 431.3(c).

Plaintiffs are the excluded members of the Confederated Tribes. They number about 321 persons of which 265 received shares of the Malheur Paiute distribution, 25 U.S.C. §§ 1011–1015. Of these 265, about 212 are also descendants of members of a treaty tribe. The other 56 plaintiffs are treaty tribe descendants who received other distributions like the distribution under the Alaska Native Claims Settlement Act, 43 U.S.C. §§ 1601–1628, or the distribution to the Indians of California, 25 U.S.C. §§ 659–663.

The plaintiffs do not include those members of the Confederated Tribes who are potential beneficiaries of 13 claims filed by other groups, like the Sioux and the Hopi Indians, which were pending when this plan was approved. They will share under the plan even if they receive distributions from these other claims. The plan also provided for four children who are descendants of a member of the Paiute Tribe and not from a member of a treaty tribe.

The Secretary's plan is neither a distribution to all descendants of the treaty tribe members nor a distribution to all of the members of the modern tribe. This plan excluded all descendants of members of the treaty tribes who are not members of the modern tribe. Among them are residents of other Indian reservations who are not enrolled as members of the modern tribe. They are not plaintiffs in this action.

Plaintiffs contend that the plan is invalid because the Secretary and the Confederated Tribes did not follow required procedures. They also contend that this plan is arbitrary and capricious. They further contend that it is inconsistent with the Indian Civil Rights Act, (ICRA), 25 U.S.C. §§ 1301–1341 and that it violates their due process and equal protection rights under the Constitution.

I find that this court does not have jurisdiction over the action against the Confederated Tribes.

I further find that the Secretary, when he prepared this judgment distribution plan, failed to follow the procedures mandated by both the Distribution of Judgment Funds Act and his regulations. These errors prejudiced plaintiffs because they were

denied the protection of these procedures. Plaintiffs are therefore entitled to relief from the federal defendants.

*Action against the Confederated Tribes*

The Confederated Tribes contend that sovereign immunity bars plaintiffs' action against it.

■ An Indian tribe is protected by sovereign immunity unless Congress has unequivocally consented to a waiver of that immunity. *Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 58–59, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978).

Plaintiffs contend that the Confederated Tribes, in the corporate charter it adopted under the Indian Reorganization Act, 25 U.S.C. § 477, waived its immunity with the consent of Congress. Plaintiffs rely on *Martinez v. Southern Ute Tribe,* 150 Colo. 504, 374 P.2d 691 (1962), which held that the same corporate charter provision applied to the tribe's governmental conduct as well as its corporate conduct and that the tribe therefore waived its sovereign immunity for all tribal conduct.

■■ In my view, the more persuasive cases hold that a tribe's corporate charter does not waive the tribe's sovereign immunity for governmental conduct. *Parker Drilling Co. v. Metlakatla Indian Community,* 451 F.Supp. 1127 (D.Alaska 1978); *Confederated Tribes of Colville Indian Reservation v. Washington,* 446 F.Supp. 1339, 1351 n. 12 (E.D.Wash.1978), *juris. postponed until consideration of merits,* 440 U.S. 905, 99 S.Ct. 1210, 59 L.Ed.2d 452 (1979); *Atkinson v. Haldane,* 569 P.2d 151, 170–175 (Alaska 1977). I find that the tribe's minimal participation in the preparation of this plan was governmental conduct and that sovereign immunity therefore bars plaintiffs' action against the Confederated Tribes.

■ Even if this court had jurisdiction over this action, plaintiffs would not be entitled to relief from the Confederated Tribes because the Tribal Council was not given any discretion; it acted only on the instructions of the government.

■ Plaintiffs do not have an implied cause of action against the Confederated Tribes for equitable relief under the ICRA. *Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 59–72, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978). Plaintiffs failed to establish that the Confederated Tribes violated any obligation to these plaintiffs under the Distribution of Judgment Funds Act.

*Action against the Government*

In an earlier opinion, I held that this court has jurisdiction over plaintiffs' action against the federal defendants under 28 U.S.C. § 1331.

The government admits that it did not follow required procedures when it developed this plan. It asserts that it "substantially complied" with the required procedures and that its errors are therefore harmless.

The Secretary was required to determine the proper beneficiaries of this judgment. Weston admits that he assumed that the prior court decisions on the tribe's capacity to sue controlled the determination of the beneficiaries and that he so advised the Confederated Tribes. The Secretary adopted Weston's assumptions and informed the Confederated Tribes that court decisions controlling the tribe's capacity to bring an action also controlled the distribution of the judgment. This was incorrect. *See The Confederated Tribes of the Warm Springs Reservation v. United States,* 177 Ct.Cl. 184, 210 (1966).

I find that the Secretary not only overlooked plaintiffs' possible interests, but also gave erroneous instructions to the Confederated Tribes based on inadequate and erroneous information. This was not the kind of determination which the Act requires the Secretary to make. 25 U.S.C. § 1403.

The Secretary was also required to determine if any of this money would be used for tribal purposes. 25 U.S.C. § 1403(b)(5). He did not properly make this determination because he decided not to use any of this money for tribal purposes on the basis of his erroneous interpretation of prior court decisions.

The Secretary did not provide the expert assistance contemplated by the Act. Weston, who relied on his experience rather than the "necessary research" required by the Act and the regulations, provided the only assistance offered members of the Confederated Tribes. Weston admits that he, when he prepared the plan, did not then recognize the diverse ancestry of the tribal members, did not understand the court proceedings which led to the settlement, and assumed that these Indian Claims Commission and Court of Claims proceedings determined the beneficiaries of the judgment. He did not consider whether claims belonging to the modern tribe were foreclosed by the settlement. I find that this assistance was inadequate.

The Secretary was obligated to give appropriate notice 20 days before the public hearing. He gave only 19 days notice by general advertising in distant newspapers and by an announcement in the tribal newsletter. These notices were less extensive and much more general than the notices of the earlier settlement referendum which included several timely mailings to all members of the Confederated Tribes, informational meetings, and articles in the Madras newspaper. Although shortly before the hearing notices were also posted on the reservation and published in the tribal newsletter, the Secretary failed to give adequate notice.

The Secretary failed to inform Congress of these procedural irregularities and his description of plaintiffs' position was misleading or at least ambiguous.

The government admits that it neither submitted a timely plan to Congress nor requested the extension required by the Act.

■ Nevertheless the government asserts that these procedural irregularities do not invalidate this distribution plan for a number of reasons. The government had contended that Congress adopted this plan when it did not veto it. The government has now abandoned this contention and says the Act calls for an unconstitutional "legislative veto", and that the plan should be treated like any other administrative action authorized by an appropriate delegation from Congress. It is unnecessary to determine whether this plan is a legislative enactment or an administrative decision because the statements to Congress were so ambiguous and the procedural irregularities so numerous that Congress' failure to veto this plan cannot be construed as a legislative adoption. Even if it were construed as an administrative determination, under the facts of this case, it would be invalid.

The government argues that the plan is rational and should not be disturbed under the standard announced in *Delaware Tribal Business Committee v. Weeks*, 430 U.S. 73, 97 S.Ct. 911, 51 L.Ed.2d 173 (1977). *Weeks* provides that a "legislative judgment should not be disturbed '[a]s long as the special treatment can be tied rationally to the fulfillment of Congress' unique obligation toward the Indians . . . .' *Morton v. Mancari*, [417 U.S. 535], 555, 94 S.Ct. 2474, 41 L.Ed.2d 290 [(1974)]." 430 U.S. at 85, 97 S.Ct. at 919.

It is also unnecessary to decide whether an administrative judgment distribution plan is entitled to the same deference *Weeks* gives to a legislative determination because an agency must follow its own procedures even when those procedures are more rigorous than would otherwise be required. *Morton v. Ruiz*, 415 U.S. 199, 230–236, 94 S.Ct. 1055, 39 L.Ed.2d 270 (1974).

The Administrative Procedure Act obligates the BIA to follow the procedures established by Congress as well as those established by its own regulations and, if it fails to do it, a reviewing court can set aside agency action subject only to the rule of prejudicial error. 5 U.S.C. § 706.[6]

---

**6.** The Act provides that:

"The reviewing court shall—

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(D) without observance of procedure required by law;

The government contends that these errors were not prejudicial. I disagree. These plaintiffs are among the potential beneficiaries of this judgment whom the Act and the regulations are intended to protect.

Plaintiffs made many arguments intended to show that this plan is invalid because its substantive result is unacceptable. They argue that the plan improperly discriminates against Paiutes, arbitrarily excludes certain members of the Confederated Tribes because of their participation in earlier distributions from other sources, and improperly disregards the interests of plaintiffs. These arguments are directed to the merits of the plan.

■ In my view, the difficulty with the plan is not that it is inequitable and unjust; that is a question for tribal, administrative and legislative determination provided the plan was properly prepared and presented. I find that the plan is invalid because plaintiffs were deprived of an opportunity to present their arguments to the members of the tribe and to the Council before the proposal was sent to the Secretary and to Congress. Inadequate notice, absence of expert assistance, and misleading advice from the designated representative of the BIA combined to deprive plaintiffs of the opportunity to make available arguments not only to the tribe, but also to the Secretary and to Congress. These procedural errors therefore prejudiced the presentation of plaintiffs' position and misled the Secretary and Congress.

These procedural errors are particularly significant in the context of the government's special obligation to Indians.

"The denial of benefits to these [claimants] . . . under such circumstances is inconsistent with 'the distinctive obligation of trust incumbent upon the Government in its dealings with these dependent and sometimes exploited people.' *Seminole Nation v. United States,* 316 U.S. [286], 296, 62 S.Ct. 1049, 86 L.Ed. 1480." *Morton v. Ruiz,* 415 U.S. 199, 236, 94 S.Ct. 1055, 1075, 39 L.Ed.2d 270 (1974).

I do not pass on plaintiffs' substantive objections to the plan and express no opinion on its merit. Plaintiffs are entitled to develop their objections to the plan in the context of the required procedures before the tribe, the Secretary and Congress. The Secretary's failure to follow the procedures established by statute and regulation invalidates the plan regardless of its merit.

■ Because of the many errors in the formulation of the plan, the elapse of more than 270 days before the plan was submitted to Congress, and the elapse of more than five years since Congress appropriated money for this judgment, I believe the Secretary no longer has the authority to adopt a plan for the distribution but must submit a plan for the distribution as proposed legislation to Congress.[7]

■ Plaintiffs contend that they cannot constitutionally be omitted from any future plan. I believe Congress may rationally decide, after considering the relevant information and hearing plaintiffs' arguments, to exclude some or all plaintiffs. *See Delaware Tribal Business Committee v. Weeks,* 430 U.S. 73, 97 S.Ct. 911, 51 L.Ed.2d 173 (1977). I will not limit the choices available to the Secretary on remand.

The Secretary is enjoined from distributing the Warm Springs Judgment in accordance with the plan promulgated May 2, 1975 and is directed to submit to Congress legislation providing for the distribution.

Plaintiffs' action against the Confederated Tribes is dismissed.

This opinion shall constitute findings of fact and conclusions of law under Fed.R. Civ.P. 52(a).

In making the foregoing determinations, . . . due account shall be taken of the rule of prejudicial error."

7. *See Hearing on S. 1016 Before the Subcomm. on Indian Affairs of the Senate Comm. on Interior and Insular Affairs,* 93d Cong., 1st Sess., at 21–22, 33–35 (1973).