874 F.2d 709
 SENECA-CAYUGA TRIBE OF OKLAHOMA, an organized Tribe of
Indians, as Recognized Under and by the Laws of
the United States, Plaintiff-Appellee,
v.
STATE OF OKLAHOMA ex rel. David L. THOMPSON, the duly
elected District Attorney of Ottawa County, Oklahoma, Bob
Sills, the duly elected Sheriff of Ottawa County, Oklahoma;
Jon D. Douthitt, Associate District Judge for the 13th
Judicial Administrative District of Oklahoma, Defendants-Appellants.
QUAPAW TRIBE OF OKLAHOMA, a Federally recognized Indian
Tribe; Jesse McKibben, Chairman of Quapaw Tribe
of Oklahoma, Plaintiffs-Appellees,
v.
STATE OF OKLAHOMA ex rel. David L. THOMPSON, District
Attorney of Ottawa County, Morland T. Barton, Assistant
District Attorney of Ottawa County; Bob Sills, the duly
elected Sheriff of Ottawa County, Oklahoma; Jon D.
Douthitt, Judge of the District Court of Ottawa County,
Defendants-Appellants.
 No. 86-1885.
 United States Court of Appeals,
Tenth Circuit.
 May 3, 1989.
 
 David A. Thompson, Dist. Atty. (Thomas H. May, Dist. Atty. and Morland T. Barton, Asst. Dist. Atty., with him on the briefs), Miami, Okl., for defendants-appellants.
 Ben Loring, Hall, Loring & Smith, P.C. of Miami, Okl., for plaintiff-appellee Seneca-Cayuga Tribe of Oklahoma.
 John H. Charloe, of Tulsa, Okl., for plaintiff-appellee Quapaw Tribe of Oklahoma and Jesse McKibben.
 Before SEYMOUR and BARRETT, Circuit Judges, and BROWN*, District Judge.
 SEYMOUR, Circuit Judge.
 
 
 1
 The Seneca-Cayuga Tribe of Oklahoma and the Quapaw Tribe of Oklahoma are federally recognized Indian tribes that operate high-stakes bingo games on trust land. They brought this action to enjoin a pending state court suit in which the State of Oklahoma sought to enjoin operation of the bingo games. The federal court held that it was not required to abstain, and issued a preliminary injunction. We affirm.
 
 I.
 BACKGROUND
 
 2
 In 1983, the State of Oklahoma sued the Seneca-Cayuga and Quapaw Tribes in separate actions in state court seeking to enjoin the operation of Tribal bingo games, which violate the gaming laws of the state, see Okla.Stat.Ann. tit. 21, Secs. 995.1-18 (1981). Shortly thereafter, the Seneca-Cayuga Tribe filed suit in federal court and was granted a preliminary injunction restraining state officials from enforcing state gaming laws on Indian land. The state district court subsequently dismissed the state suits against both Tribes for lack of subject matter jurisdiction, and the Seneca-Cayuga Tribe voluntarily dismissed the federal action. In July 1985, the Supreme Court of Oklahoma reversed the lower state court, holding that the actions were not barred by the Tribes' sovereign immunity and remanding for further findings on other issues. State ex rel. May v. Seneca-Cayuga Tribe of Oklahoma, 711 P.2d 77 (Okla.1985) (Seneca-Cayuga I ).
 
 
 3
 The Tribes brought the present action seeking declaratory and injunctive relief against the State of Oklahoma and the state trial judge, the Honorable Jon D. Douthitt. The parties entered into extensive stipulations of fact, which are set forth briefly as follows. The bingo operations at issue are held in buildings used exclusively for bingo, and located on land held in trust for the Tribes. The players are primarily non-Indians. All or most of the games are in violation of state statutes, and no federal or state taxes are withheld from the prizes. The bingo games provide employment for Tribal members, and income which is used to fund Tribal health and welfare programs.
 
 
 4
 The district court denied a motion by the State asking it to abstain from exercising its jurisdiction because of the pending state action. Based on the stipulations, the court then enjoined Judge Douthitt from proceeding with the state court suit between the State and the Tribes, and enjoined the State from interfering with the operation of the bingo games.
 
 
 5
 The State has appealed this preliminary injunction under 28 U.S.C. Sec. 1292(a)(1) (1982). Its primary argument for reversal is that the district court should have abstained under the doctrine of Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), and its progeny. In assessing this contention, we must consider California v. Cabazon Band of Mission Indians, 480 U.S. 202, 107 S.Ct. 1083, 94 L.Ed.2d 244 (1987), issued after the district court opinion in this case, which addresses the conflict between a tribe's right to operate bingo games and a state's right to control gambling.
 
 II.
 YOUNGER ABSTENTION
 
 6
 Federal courts have a "virtually unflagging obligation" to exercise the jurisdiction granted them by Congress. See Colorado River Water Conservation Dist. v. United States, 424 U.S. 800, 817, 96 S.Ct. 1236, 1246, 47 L.Ed.2d 483 (1976). As courts within a federalist system, however, they are on rare occasions permitted or required not to exercise their jurisdiction where such inaction is necessary to avoid undue interference with states' conduct of their own affairs. See id. at 813-18, 96 S.Ct. at 1244-47. The Younger doctrine sets forth principles for determining when it is appropriate to abstain from interfering with a state judicial proceeding. See Younger, 401 U.S. at 45, 91 S.Ct. at 751 ("the normal thing to do when federal courts are asked to enjoin pending state proceedings in state courts is not to issue such injunctions").
 
 
 7
 Younger abstention requires an ongoing state judicial (or in a proper case administrative) proceeding, the presence of an important state interest, and an adequate opportunity to raise federal claims in the state proceedings. See Middlesex County Ethics Comm. v. Garden State Bar Ass'n, 457 U.S. 423, 432, 102 S.Ct. 2515, 2521, 73 L.Ed.2d 116 (1982). Each of these conditions must be satisfied before Younger abstention is warranted. Id. at 432, 102 S.Ct. at 2521. Younger abstention is not discretionary once the above conditions are met, see Colorado River, 424 U.S. at 817 n. 22, 96 S.Ct. at 1246 n. 22, absent extraordinary circumstances that render a state court unable to give state litigants a full and fair hearing on their federal claims,[1] see Trainor v. Hernandez, 431 U.S. 434, 442 n. 7, 97 S.Ct. 1911, 1917 n. 7, 52 L.Ed.2d 486 (1977) (quoting Kugler v. Helfant, 421 U.S. 117, 124-25, 95 S.Ct. 1524, 1530-31, 44 L.Ed.2d 15 (1975)); Younger, 401 U.S. at 53, 91 S.Ct. at 754-55. Accordingly, our review is de novo. Accord Fresh Int'l Corp. v. Agricultural Labor Relations Bd., 805 F.2d 1353, 1356 & n. 2 (9th Cir.1986).
 
 
 8
 In this case, there is clearly an ongoing state judicial proceeding. Litigation in the state system has already reached the Supreme Court of Oklahoma, see Seneca-Cayuga I, 711 P.2d 77, and is now on remand in the state trial court. We therefore turn to the second Younger requirement, the necessity that the state proceeding implicate an important state interest. In view of our conclusion below that this element is lacking, we need not address the adequacy of the opportunity to raise the federal claim in state court.
 
 
 9
 The Oklahoma Supreme Court identified two state interests in the regulation of high-stakes bingo games: preventing the infiltration of organized crime, and protecting the State's economy and tax base. Seneca-Cayuga, 711 P.2d at 91. These are undoubtedly legitimate state concerns. This case, however, concerns activities that are necessarily primarily of federal interest. Moreover, the Tribes have a claim to sovereign immunity which shields them from suit in state court. We consider each of these factors in turn in assessing the magnitude of the state's interests at stake in this case.
 
 A. Primacy of Federal Interest
 
 10
 The Constitution grants to Congress the power "To regulate Commerce ... with the Indian Tribes." U.S. Const. art. I, Sec. 8, cl. 3. The treaties and other agreements that govern the relationship between the Indians and other Americans are part of "the supreme Law of the Land." Id. art. VI, cl. 2. It is Congress that has set the terms under which modern American Indians live, the United States Supreme Court that has shaped the interpretation of those terms, and the federal Bureau of Indian Affairs that has managed the day-to-day interactions with the Tribes. Indeed, Oklahoma, like many other states, was required to disclaim jurisdiction over Indians at statehood. See Oklahoma Enabling Act, ch. 3335, Sec. 3, 34 Stat. 267, 270 (1906); Enabling Act Amendment, ch. 2911, 34 Stat. 1286 (1907); see generally Indian Country, U.S.A., Inc. v. Okla. Tax Comm'n., 829 F.2d 967, 976-81 (10th Cir.1987) (citing Sec. 1 of the Oklahoma Enabling Act and interpreting it as a general reservation of federal and tribal jurisdiction over Indians and their lands and property), cert. denied, --- U.S. ----, 108 S.Ct. 2870, 101 L.Ed.2d 2906 (1988).[2]
 
 
 11
 This is not to say that states have not exercised authority over reservation land, especially over non-Indians on such land. Nor is it to say that states have no right to exercise authority over activities in Indian Country. See California v. Cabazon Band of Mission Indians, 480 U.S. 202, 107 S.Ct. 1083, 1091, 94 L.Ed.2d 244 (1987) (no per se rule precluding state jurisdiction over tribes and tribal members in the absence of express congressional consent); Rice v. Rehner, 463 U.S. 713, 103 S.Ct. 3291, 77 L.Ed.2d 961 (1983) (state may require liquor license for on-reservation sale of liquor for off-premises consumption); Moe v. Confederated Salish & Kootenai Tribes, 425 U.S. 463, 96 S.Ct. 1634, 48 L.Ed.2d 96 (1976) (state may tax on-reservation sale of cigarettes to non-Indians); Seneca-Cayuga I, 711 P.2d at 85 n. 41 (listing federal statutes granting state jurisdiction). The presumption and the reality, however, are that federal law, federal policy, and federal authority are paramount in the conduct of Indian affairs in Indian Country. See Cabazon, 107 S.Ct. at 1092 n. 18 (presumption against state jurisdiction in Indian Country); Indian Country, U.S.A., 829 F.2d at 976 (same).
 
 
 12
 In this particular case, the Indian bingo games under attack by the State promote the important congressional policy of encouraging tribal self-sufficiency and economic development.[3] Similar games not only have been approved by the Department of the Interior and other Cabinet departments, they have been actively developed. See Cabazon, 107 S.Ct. at 1092-93. The Tribes' bingo games thus manifest both congressional and executive policy. In contrast, where the Supreme Court has mandated that federal courts abstain, the matter being litigated in state court has been a "traditional area of state concern," Moore v. Sims, 442 U.S. 415, 435, 99 S.Ct. 2371, 2383, 60 L.Ed.2d 994 (1979), with a federal claim asserted to change the state's conduct of its affairs. See Pennzoil Co. v. Texaco, Inc., 481 U.S. 1, 107 S.Ct. 1519, 95 L.Ed.2d 1 (1987) (execution of state court judgment); Ohio Civil Rights Comm'n v. Dayton Christian Schools, 477 U.S. 619, 106 S.Ct. 2718, 91 L.Ed.2d 512 (1986) (sex discrimination); Middlesex, 457 U.S. 423, 102 S.Ct. 2515 (professional conduct of lawyers); Moore, 442 U.S. 415, 99 S.Ct. 2371 (family relations child welfare); Trainor, 431 U.S. 434, 97 S.Ct. 1911 (state welfare program); Juidice v. Vail, 430 U.S. 327, 97 S.Ct. 1211, 51 L.Ed.2d 376 (1977) (state contempt proceedings); Huffman v. Pursue Ltd., 420 U.S. 592, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975) (local nuisances); Younger, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971) (state criminal proceedings).
 
 
 13
 The Supreme Court has indicated that state interests are not of great weight in circumstances like those before us. This is not a case involving off-reservation activities, see Mescalero Apache Tribe v. Jones, 411 U.S. 145, 93 S.Ct. 1267, 36 L.Ed.2d 114 (1973), or non-reservation Indians, see Organized Village of Kake, 369 U.S. 60, 82 S.Ct. 562. Nor is it a case governed by non-exclusive treaty language, see Puyallup Tribe, Inc. v. Washington Game Department, 433 U.S. 165, 97 S.Ct. 2616, 53 L.Ed.2d 667 (1977), or one in which the on-reservation activities result merely from "marketing an exemption" to state law, see Washington v. Confederated Tribes of the Colville Indian Reservation, 447 U.S. 134, 100 S.Ct. 2069, 65 L.Ed.2d 10 (1980); cf. Cabazon, 107 S.Ct. at 1094 (Indian bingo "generat[es] value on the reservations through activities in which [Tribes] have a substantial interest"); Indian Country, U.S.A., 829 F.2d at 986 (Indian bingo does not fall within "marketing an exemption" caselaw). Rather, the State seeks here to assert the authority to regulate activities established by Indians under tribal ordinances and operating in Indian Country.[4] The regulation is aimed at the conduct of the games themselves, not the conduct of the non-Indian customers of the Tribes' games. In such cases, the Supreme Court has specifically held that federal interests outweigh both of the state interests identified by the Oklahoma Supreme Court. See Cabazon, 107 S.Ct. at 1094-95 (state concern over organized crime insufficient to escape preemption in Indian bingo case); White Mountain Apache Tribe v. Bracker, 448 U.S. 136, 100 S.Ct. 2578, 65 L.Ed.2d 665 (1980) (state revenue interest insufficient to support state tax of on-reservation activities that cost state nothing). Similarly, we have recently held that Oklahoma's interest in preventing organized crime[5] and protecting its revenue base are insufficient to escape preemption of its gambling laws as applied to bingo games on other tribal lands. See Indian Country, U.S.A., 829 F.2d at 982, 987.
 
 
 14
 Furthermore, the threshold question whether the State has authority to regulate Indian bingo is a matter of federal law. See Colville, 447 U.S. at 154, 100 S.Ct. at 2081 ("tribal sovereignty is dependent on, and subordinate to, only the Federal Government, not the States"). State regulatory authority over Indian bingo in Indian Country depends on a determination either that federal law has not preempted state authority, or that state regulation would not infringe on tribal self-government. See Cabazon, 107 S.Ct. at 1091-92; Three Affiliated Tribes of the Fort Berthold Reservation v. Wold Engineering, P.C., 467 U.S. 138, 147, 104 S.Ct. 2267, 2273-74, 81 L.Ed.2d 113 (1984); White Mountain Apache Tribe, 448 U.S. at 142, 100 S.Ct. at 2582-83; Mescalero Apache Tribe, 411 U.S. at 148, 93 S.Ct. at 1270; Williams v. Lee, 358 U.S. 217, 220, 79 S.Ct. 269, 270-71, 3 L.Ed.2d 251 (1959). Although the Oklahoma Supreme Court has articulated a new basis for state authority over activities in Indian Country on state law grounds, see Seneca-Cayuga I, 711 P.2d at 88, that court also recognized that the question of whether "residual" jurisdiction exists may not be reached until the federal issues have been resolved. See id.
 
 
 15
 The question of jurisdiction, in the sense of the State's authority to regulate, is central to the State's case because the Tribes concede in this federal litigation that if State laws apply, the Tribes' games do not comply with them. Stipulations, I, # 4. State courts are, of course, competent to decide such jurisdictional questions, but the fact that this central issue is not one of state law indicates that the importance of the State's interest in the state litigation is minimal. Where, as in this case, a state court is asked to decide issues of federal law in an area in which federal interests predominate, the State's interest in the litigation is in our view not important enough to warrant Younger abstention. Nor would resolution of these issues in state court prevent conflict between the interests of the Tribes, protected by federal law, and the interests of the State. That conflict is inevitable. Because abstention would not mitigate this conflict, the proper forum to resolve it is federal court. Cf. United States v. Composite Bd. of Medical Examiners, 656 F.2d 131, 136 (5th Cir.1981) (holding alternatively that purpose of Younger abstention is to avoid conflict between state and federal governments; where conflict unavoidable, proper forum is federal court).
 
 B. Sovereign Immunity
 
 16
 The relative insignificance of Oklahoma's interest in this case is further demonstrated by the lack of jurisdiction in the state court to hear the suit against the Tribes. As the analysis set out below demonstrates, the Tribes' sovereign immunity shields them from such suits. Sovereign immunity is a jurisdictional question, see Puyallup Tribe, 433 U.S. at 172, 97 S.Ct. at 2621; United States v. United States Fidelity & Guaranty Co., 309 U.S. 506, 512, 60 S.Ct. 653, 656, 84 L.Ed. 894 (1940); Chemehuevi Indian Tribe v. California St. Bd. of Equalization, 757 F.2d 1047, 1051 (9th Cir.1985), rev'd on other grounds, 474 U.S. 9, 106 S.Ct. 289, 88 L.Ed.2d 9 (1987); Ramey Constr. Co., 673 F.2d at 318, and the state suit against the Tribes is barred where, as here, the Tribes have refused to waive their sovereign immunity.
 
 
 17
 It is a fundamental principle of Indian law that Indian tribes are sovereign entities. As dependent sovereigns, they retain "attributes of sovereignty over both their members and their territory," United States v. Mazurie, 419 U.S. 544, 557, 95 S.Ct. 710, 717-18, 42 L.Ed.2d 706 (1975), although they do not have the full powers of sovereign nations. It has long been settled law that retained tribal sovereign immunity is co-extensive with that of the United States. See United States Fidelity & Guaranty Co., 309 U.S. at 512, 60 S.Ct. at 653; Ramey Constr. Co., 673 F.2d at 319-20. Neither a federal nor a state court has jurisdiction over a suit against a tribe absent either "an effective waiver or consent" by the tribe,[6] Puyallup Tribe, 433 U.S. at 172, 97 S.Ct. at 2621; see also Merrion v. Jicarilla Apache Tribe, 617 F.2d 537, 540 (10th Cir.1980) (en banc), aff'd, 455 U.S. 130, 102 S.Ct. 894, 71 L.Ed.2d 21 (1982), or an "unequivocal expression of contrary legislative intent" to waive sovereign immunity, Santa Clara Pueblo v. Martinez, 436 U.S. 49, 59, 98 S.Ct. 1670, 1677, 56 L.Ed.2d 106 (1978).[7] While tribal sovereign immunity is not absolute, waivers of sovereign immunity are strictly construed. See Ramey Const. Co., 673 F.2d at 320.
 
 
 18
 The Tribes have vigorously argued the issue of sovereign immunity at every stage of this litigation. The State does not contend that the Quapaw Tribe has in any way given its consent to suit against it, nor does it argue that Congress has abrogated the Tribes' sovereign immunity.[8] It does raise for the first time in this appeal the argument that the Seneca-Cayuga Tribe has waived its immunity to suit by including a "sue and be sued" clause in its corporation charter.[9] The State distinguishes contrary caselaw on the ground that special circumstances attended the drawing up of constitutions and charters by Oklahoma Indian tribes.[10] It is far too late for the State to raise this issue. It is bound by its stipulation below that "the State Court litigation is without the consent of the [Seneca-Cayuga] Tribe." Stipulations, III, # 13.
 
 
 19
 The state courts thus lack jurisdiction to hear the State's case against the Tribes. The federal nature of the law and of the issues to be decided, combined with this lack of state jurisdiction, reduce the State's interest in this litigation to the vanishing point. Cf. Champion Int'l Co. v. Brown, 731 F.2d 1406, 1409 (9th Cir.1984) (state has "no cognizable state interest in enforcing [state] laws preempted by federal law"); Baggett v. Department of Professional Regulation, 717 F.2d 521, 524 (11th Cir.1983) (no abstention where federal preemption readily apparent and state tribunal therefore acting beyond its lawful authority). The absence of a vital state interest, an essential prerequisite of Younger abstention, see Middlesex, 457 U.S. at 432, 102 S.Ct. at 2521, makes abstention unwarranted.
 
 III.
 THE PRELIMINARY INJUNCTION
 
 20
 The grant of a preliminary injunction is within the sound discretion of the district court. See Lundgrin v. Claytor, 619 F.2d 61, 63 (10th Cir.1980). A preliminary injunction may issue when the movant has shown that four conditions are met: 1) there is a substantial likelihood that he will prevail on the merits; 2) he will suffer irreparable injury unless the injunction issues; 3) the threatened injury to him outweighs whatever damage the proposed injury may cause the opposing party; and 4) the injunction, if issued, would not be contrary to the public interest. See id. Where the movant has met the last three of these conditions, this circuit has adopted the Second Circuit's definition of substantial likelihood, see Continental Oil Co. v. Frontier Ref. Co., 338 F.2d 780, 781-82 (10th Cir.1964), under which plaintiffs need only show a fair ground for litigation. Lundgrin, 619 F.2d at 63.
 
 
 21
 The State does not deny that the conditions for a preliminary injunction were satisfied below, and the record contains sufficient evidence to support the issuance of the injunction. Plaintiffs not only have a fair ground for litigation, but are likely to prevail on the merits in light of Cabazon, 480 U.S. 202, 107 S.Ct. 1083, and our decision in Indian Country, U.S.A., 829 F.2d 967. Without the preliminary injunction, the Tribes would face the prospect of significant interference with their self-government. They would lose income used to support social services for which federal funds have been reduced or are non-existent, and lose jobs employing Indians who face a rate of unemployment ranging from thirty-five percent (the Seneca-Cayuga Tribe) to close to fifty percent (the Quapaw Tribe). Stipulations II, # 6-8; III, # 4-7. The Tribes would also be forced to expend time and effort on litigation in a court that does not have jurisdiction over them, and risk inconsistent binding judgments from state and federal courts. The State, on the other hand, has no significant interest in enjoining the operation of the bingo games, under Cabazon and our reasoning in this opinion. Finally, the injunction promotes the paramount federal policy that Indians develop independent sources of income and strong self-government.
 
 
 22
 The judgment of the district court refusing to abstain and granting a preliminary injunction is AFFIRMED.
 
 
 
 *
 Honorable Wesley E. Brown, Senior Judge, United States District Court for the District of Kansas, sitting by designation
 
 
 [1]
 The district court found that the Younger conditions were met, but declined to abstain on the grounds that extraordinary circumstances made abstention improper. On appeal, the parties vigorously dispute and defend this conclusion. Because we hold that the Younger abstention conditions have not been satisfied, we need not decide whether extraordinary circumstances are present
 
 
 [2]
 We held in Indian Country, U.S.A. that Oklahoma's disclaimer is one both of proprietary and of governmental authority. See Indian Country, U.S.A., 829 F.2d at 976-81. Neither the Oklahoma Supreme Court, nor the State in this litigation, agree with that conclusion. The Oklahoma Supreme Court has held in recent years that the Oklahoma disclaimer is one of proprietary, but not of governmental, authority. See Currey v. Corporation Comm'n, 617 P.2d 177, 179-80 (Okla.1980) (disclaimer is one of proprietary interest in Indian lands), cert. denied, 452 U.S. 938, 101 S.Ct. 3080, 69 L.Ed.2d 952 (1981); see also Organized Village of Kake v. Egan, 369 U.S. 60, 69, 82 S.Ct. 562, 567-68, 7 L.Ed.2d 573 (1961) (construing Alaskan disclaimer as proprietary rather than governmental); Ahboah v. Housing Auth. of the Kiowa Tribe of Indians, 660 P.2d 625, 630 (Okla.1983) (confirming Currey ). We are not bound to follow this interpretation, however, as the Enabling Acts conferring statehood in Oklahoma are federal enactments
 The State, in this appeal, goes still further than the Oklahoma Supreme Court. The State claims not only that Oklahoma has the relevant authority to regulate the Tribes, but also that the Tribes are subject without limit to the jurisdiction of Oklahoma's courts. In support of this argument, the State recites a history of the exercise of Oklahoma jurisdiction over Indians previous to and immediately after statehood. See Brief of Appellant State of Oklahoma at 13-16. It is clear, however, that only federal and tribal courts existed prior to statehood, see Seneca-Cayuga I, 711 P.2d at 81 n. 16; see also Indian Country, U.S.A., 829 F.2d at 977-78 (chronicling gradual expansion of jurisdiction of federal courts at expense of tribal courts); Harjo v. Kleppe, 420 F.Supp. 1110, 1121 (D.D.C.1976) ("general absence of an adequate court system" led to establishment of federal courts in 1895 to supplement tribal courts), aff'd sub nom. Harjo v. Andrus, 581 F.2d 949 (D.C.Cir.1978). Both state and federal courts have rejected the State's argument that Oklahoma may exercise unlimited jurisdiction in Indian Country, see, e.g., Indian Country, U.S.A., 829 F.2d at 980 n. 6 (discussing origin and history of unlimited jurisdiction argument and citing authorities); Seneca-Cayuga I, 711 P.2d at 88-89 (no evidence that State has complied with P.L.-280's requirements for acquiring general jurisdiction; state jurisdiction exists only when tests are met for preemption and for lack of infringement on tribal self-government).
 
 
 [3]
 On October 17, 1988, Congress enacted the Indian Gaming Regulatory Act, Pub.L. No. 100-497, 102 Stat. 2467 (to be codified at 25 U.S.C. Secs. 2701-2721). This Act implements Congressional policy by providing "a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments." Id. at Sec. 3(1) (to be codified at 25 U.S.C. Sec. 2702(1))
 
 
 [4]
 Whether the land in question is Indian Country was an issue in the state litigation. The Oklahoma Supreme Court held that the land is Indian Country, see Seneca-Cayuga I, 711 P.2d at 82, and the parties have stipulated to that effect. Stipulations, II, # 4; III, # 1
 
 
 [5]
 The State's interest in preventing organized crime has also been undermined by passage of the Indian Gaming Regulatory Act, see supra note 3, one purpose of which is to shield Indian gaming from organized crime and other corrupting influences. It is apparent from this Act that the federal government intends to regulate this matter
 
 
 [6]
 But see Dry Creek Lodge, Inc. v. Arapahoe & Shoshone Tribes, 623 F.2d 682 (10th Cir.1980), cert. denied, 449 U.S. 1118, 101 S.Ct. 931, 66 L.Ed.2d 847 (1981), in which this Court found federal jurisdiction to hear a suit against a tribe after the state and tribal courts had refused to hear it. Dry Creek Lodge was based on highly unusual circumstances. See White v. Pueblo of San Juan, 728 F.2d 1307, 1312 (10th Cir.1984) (case "based on what the court regarded as absolute necessity"); Ramey Constr. Co., 673 F.2d at 319 n. 4 (Dry Creek Lodge concerned with "particularly egregious allegations of personal restraint and deprivation of personal rights"). Plaintiffs had gone to considerable expense in reliance upon the word of the supervisor of a reservation, and had then been cut off by Indian neighbors not only from the opportunity to recover their expenses but also from access to the only road off their land. This Court concluded that Santa Clara Pueblo v. Martinez, 436 U.S. 49, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978), was not meant to bar federal jurisdiction where plaintiffs' rights had been egregiously violated and tribal remedies were wrongfully denied to plaintiffs. See Dry Creek Lodge, 623 F.2d at 685. Later cases in this Court suggest that Dry Creek Lodge is to be narrowly construed. See White, 728 F.2d 1307; Ramey Constr. Co., 673 F.2d 315
 
 
 [7]
 Current federal policy is to strengthen tribal sovereignty. See Indian Reorganization Act of 1934, 25 U.S.C. Secs. 461-479 (1982 & Supp. IV 1986); New Mexico v. Mescalero Apache Tribe, 462 U.S. 324, 334-35, 103 S.Ct. 2378, 76 L.Ed.2d 611 (1983); Santa Clara Pueblo, 436 U.S. at 62-64, 98 S.Ct. at 1679-80. The infringement on tribal self-government analysis adopted in Seneca-Cayuga I, 711 P.2d at 83-84, 89-92 (sovereign immunity has given way to a preemption/infringement on tribal self-government test), has never been applied by a federal court to sovereign immunity questions. It is unlikely to be so applied, because suits against a tribe absent tribal consent infringe on the exercise of self-government. Cf. Santa Clara Pueblo, 436 U.S. at 59-60, 98 S.Ct. at 1677-78 (providing federal forum to enforce Indian Civil Rights Act interferes with tribal autonomy and self-government)
 
 
 [8]
 The State's brief asserts that there are no barriers to state assertion of jurisdiction over the Tribes on the ground that the State has had jurisdiction over them since statehood on the basis of "prior existing jurisdiction." Brief of Appellant State of Oklahoma at 13-16; see also Seneca-Cayuga I, 711 P.2d at 88-90 (discussing "residual" state jurisdiction). Whether or not this theory is tenable as a matter of federal law, it addresses only the question of authority to regulate the Tribes, not the question of tribal amenability to suit. To understand it in the latter sense would be to give state courts jurisdiction when federal courts lack it, a result completely contrary to the history of federal primacy in the area of Indian law and policy
 
 
 [9]
 Sections 16 and 17 of the Indian Reorganization Act, 25 U.S.C. Sec. 476, 477 (1982), authorize tribes to organize and adopt a constitution and a corporate charter. The corporate charters usually include a "sue and be sued" clause to enable the tribes to engage in commercial activity as corporations without losing their sovereign immunity as tribes. This court has held that the presence of such a clause in a tribal corporate charter does not waive the tribe's immunity as a tribe. See Ramey Constr. Co., 673 F.2d at 320; see also Kenai Oil & Gas, Inc. v. Department of Interior, 522 F.Supp. 521 (C.D.Utah 1981), aff'd and remanded, 671 F.2d 383 (10th Cir.1982). See also Gold v. Confederated Tribes of the Warm Springs Indian Reservation, 478 F.Supp. 190, 196 (D.Or.1979); Boe v. Fort Belknap Indian Community, 455 F.Supp. 462 (D.Mont.1978), aff'd., 642 F.2d 276 (9th Cir.1981); Atkinson v. Haldane, 569 P.2d 151 (Alaska 1977); but see Martinez v. Southern Ute Tribe, 150 Colo. 504, 374 P.2d 691 (1962) (construing "sue and be sued" clause as rendering tribe amenable to suit in Colorado state court under Colorado constitution); cf. Fontenelle v. Omaha Tribe of Nebraska, 430 F.2d 143 (8th Cir.1970) (tribe/corporation distinction not raised)
 
 
 [10]
 Section 473 of the Indian Reorganization Act provides that sections 476 and 477 do not apply to the Seneca tribe of Oklahoma. The Seneca-Cayuga Tribe organized instead under section 3 of the Oklahoma Indian Welfare Act, 25 U.S.C. Secs. 501-510 (1982). We express no opinion as to the effect of this distinction