**COLORADO INTERSTATE GAS COMPANY, and Northern Natural Gas Company, Plaintiffs,**

v.

**STATE OF OKLAHOMA, ex rel. COMMISSIONERS OF the LAND OFFICE, and the Honorable Henry Bellmon, Robert S. Kerr III, Gerald E. Hoeltzel, Clifton H. Scott, and Jack Craig, as the Commissioners of the Land Office of the State of Oklahoma, Defendants.**

No. CIV-90-498-P.

United States District Court,
W.D. Oklahoma.

March 12, 1991.

Donna N. Blakley, H.B. Watson, Jr., Sharon Taylor Thomas, Watson & McKenzie, Oklahoma City, Okl., for plaintiffs.

James T. Dupre, Oklahoma City, Okl., for defendants.

## ORDER ON MOTION TO DISMISS

PHILLIPS, District Judge.

### I. *Introduction*

In this declaratory judgment action, plaintiffs seek the Court's declaration that certain Oklahoma statutes relating to the oil and gas industry are unconstitutional. Presently at issue is defendants' motion to dismiss the action. For the reasons set forth below, the Court dismisses plaintiffs' preemption claim and abstains from deciding the remaining claims in plaintiffs' second amended complaint. However, rather than dismiss the case, the Court retains jurisdiction for final disposition, pending resolution of the concurrent state court proceedings.

### II. *Factual background*

The facts are not in dispute. Plaintiffs are Colorado Interstate Gas Company ("CIG") and Northern Natural Gas Company ("NNG"). Pursuant to numerous gas purchase agreements that the plaintiffs have entered into with gas producers,

plaintiffs purchase gas produced from wells located throughout the State of Oklahoma. Under the terms of most of the gas purchase agreements, plaintiffs are required to and are legally entitled to pay the proceeds due for the gas to the producers of the gas. The producers in turn are responsible, under the gas purchase agreements, for making all royalty payments and other payments due under the various oil and gas leases between the producers and the mineral owners.

Defendants are the State of Oklahoma, *ex rel.* Commissioners of the Land Office ("CLO") and the individual commissioners. The CLO is a royalty owner under numerous oil and gas leases that cover the spacing units from which plaintiffs purchase gas. Under the terms of the CLO's oil and gas leases, the producer of the gas owns and is entitled to sell the gas produced from the leased lands. Further under the terms of the oil and gas leases, the producer is solely responsible for the payment of royalties to the CLO.

The CLO is not a seller of gas under any of the plaintiffs' gas purchase agreements. The plaintiffs have no contractual or other relationship with the CLO by which the plaintiffs have any liability to the CLO for the payment of proceeds from the sale of gas, or for the payment of royalties, or for the payment of any other payments that may be due under the terms of the CLO's oil and gas leases.

Plaintiffs challenge the constitutionality of three Oklahoma statutes which, generally speaking, purport to impose upon plaintiffs, as purchasers of gas, liability directly to the CLO for royalties due under the CLO's oil and gas leases. The three challenged statutes are 64 Okla.Stat. § 293, effective July 1, 1987; 52 Okla.Stat. § 87.1, as amended effective October 18, 1985; and 52 Okla.Stat. § 540, effective July 1, 1980.

On July 1, 1987, the Governor of the State of Oklahoma signed into law an act which had been passed by the Oklahoma Legislature as House Bill No. 1110 (1987 Okla.Sess. Laws Chapter 204). The enabling legislation for House Bill. No. 1110 is found, in part, at 64 Okla.Stat. § 293,

which became effective on July 1, 1987. Section 293 provides as follows:

A. The royalty proceeds derived from the sale of oil or gas production under any oil and gas lease granted by the Commissioners of the Land Office shall be paid to the Commissioners commencing no later than six (6) months after the date of first sale, and thereafter no later than sixty (60) days after the end of the calendar month within which subsequent production is sold. Such payment is to be made to the Commissioners by the first purchasers of such production. Provided, such purchasers may remit to the Commissioners semiannually for the aggregate of six (6) months' accumulation of monthly proceeds of amounts less than Fifteen Dollars ($15.00).

B. Any said first purchaser who fails to comply with the provisions of this section shall be liable to the Commissioners for the unpaid amount of such royalty proceeds with interest thereon at the rate of sixteen percent (16%) per annum, calculated from date of first sale.

C. The Commissioners shall be entitled to recover any court costs and reasonable attorney's fees incurred in recovering any monies due pursuant to the terms of this section.

64 Okla.Stat. § 293. For each well in the state from which plaintiffs purchase gas and which is subject to a CLO lease, this statute purports to impose on plaintiffs liability directly to the CLO for royalty due under such lease for gas purchased by plaintiffs. This purported imposition of liability is directly contrary to the terms of plaintiffs' gas purchase agreements.

On June 7, 1985, the Governor of the State of Oklahoma signed into law an act which had been passed by the Oklahoma Legislature as Senate Bill No. 160 (1985 Okla.Sess. Laws Chapter 141), which act amended certain provisions of 52 Okla.Stat. §§ 540 and 87.1. Those amendments became effective on October 18, 1985. Senate Bill No. 160 contains, among other things, the following amendments to 52 Okla.Stat. § 87.1, which purport to affect the liability of the plaintiffs:

In the event a producing well or wells are completed upon a unit where there are, or may thereafter be, two or more separately owned tracts, the first purchaser or purchasers shall be liable to any royalty owner or group of royalty owners holding the royalty interest under a separately owned tract included in such drilling and spacing unit for the payment of proceeds from the sale of production from the drilling and spacing unit.

\* \* \* \* \* \*

The first purchaser or purshasers shall also be jointly and severally liable for the payment to each royalty interest owner of any production payments or other obligations for the payment of monies contained within the leases convering any lands lying within the drilling and spacing unit. Nothing in this act shall relieve a lessee or his assignees from any obligations imposed by the lease.

52 Okla.Stat. § 87.1. This statute purports to impose on plaintiffs liability directly to the CLO (a) for royalties due under the CLO's oil and gas leases for gas purchased by the plaintiffs, (b) for royalties due under the CLO's oil and gas leases for gas and oil purchased by other purchasers, and (c) for other lessor-lessee lease contract money obligations which are not related to the purchase of gas or oil. Such liability is directly contrary to the terms of the plaintiffs' gas purchase agreements and to the CLO's oil and gas leases granted to producers.

On May 9, 1980, the Governor of the State of Oklahoma signed into law an act which had been passed by the Oklahoma Legislature as Senate Bill No. 491 (1980 Okla.Sess. Laws Chapter 205). The enabling legislation for Senate Bill No. 491 is found at 52 Okla.Stat. § 540, which became effective July 1, 1980. Section 540 provides, in pertinent part, as follows:

A. The proceeds derived from the sale of oil or gas production from any oil or gas well shall be paid to persons legally entitled thereto, commencing no later than six (6) months after the date of first sale, and thereafter no later than sixty (60) days after the end of the calendar month within which subsequent production is sold. Such payment is to be made to persons entitled thereto by the first purchasers of such production. . . . The first purchasers of such production shall be exempt from the provisions of this subsection and the owner of the right to drill and to produce under an oil and gas lease or force pooling order shall be substituted for the first purchaser therein where the owner and purchaser have entered into arrangements where the proceeds are paid by the purchaser to the owner who assumes the responsibility of paying the proceeds to the persons legally entitled thereto.

\* \* \* \* \* \*

D. Any said first purchasers or owner of the right to drill and produce substituted for the first purchaser as provided herein that violates this section shall be liable to the persons legally entitled to the proceeds from production for the unpaid amount of such proceeds with interest thereon at the rate of twelve percent (12%) per annum, calculated from date of first sale.

52 Okla.Stat. § 540. For each well in the state from which plaintiffs purchase gas and which is subject to a CLO lease, this statute purports to impose on plaintiffs liability directly to the CLO for royalty due under the CLO's oil and gas leases for gas purchased by plaintiffs, unless plaintiffs and the producer have entered into an arrangement whereby the producer assumed responsibility for the payment of royalties.

### III. *Procedural posture of the case*

On March 28, 1990, plaintiffs filed their initial complaint that contained four (4) counts and challenged only one statute, namely, 64 Okla.Stat. § 293. On May 8, 1990, defendants filed a motion to dismiss the complaint, but the motion was subsequently rendered moot when the plaintiffs filed an amended complaint. *See* Minute Order (Aug. 7, 1990).

On June 15, 1990, plaintiffs filed their amended complaint that contained nine (9) counts. In this amended complaint plaintiffs challenged not only 64 Okla.Stat. § 293 but also 52 Okla.Stat. §§ 87.1 and 540. On June 28, 1990, defendants filed a

motion to dismiss the amended complaint. Plaintiffs responded to the motion on July 12, 1990, and the motion is presently at issue.

On September 27, 1990, plaintiffs filed a second amended complaint that incorporated by reference the previously asserted nine counts and asserted one additional count that alleged the three statutes not only violate the Contract Clause and the Fourteen Amendment, as alleged in the amended complaint, but also violate the Supremacy Clause and the Commerce Clause. On October 5, 1990, defendants filed a motion to dismiss the second amended complaint. Plaintiff CIG and plaintiff NNG each filed a response to this motion on October 22, 1990. This motion is also at issue.

The second amended complaint asserts the following counts:

I. Declaratory judgment that 64 Okla. Stat. § 293 violates the Contract Clause of the United States Constitution.

II. Declaratory judgment that 52 Okla.Stat. § 87.1 violates the Contract Clause of the United States Constitution.

III. Declaratory judgment that 64 Okla.Stat. § 293 violates the Fourteenth Amendment of the United States Constitution.

IV. Declaratory judgment that 52 Okla.Stat. § 87.1 violates the Fourteenth Amendment of the United States Constitution.

V. Declaratory judgment that 52 Okla.Stat. § 540 violates the Fourteenth Amendment of the United States Constitution.

VI. Declaratory judgment that the three statutes, if applied retroactively, would impair plaintiffs' vested contract rights and would create new duties and obligations against plaintiffs and in favor of defendants, which duties and obligations would be inconsistent with (a) pre-existing law, (b) the express terms of the gas purchase agreements, and (c) plaintiffs' right to due process of law.

VII. Declaratory judgment that as a matter of statutory construction, 64 Okla.Stat. § 293 and 52 Okla.Stat. § 87.1 cannot impose any liability on plaintiffs because at the time those laws were enacted, plaintiffs had entered into arrangements with producers pursuant to the then-existing version of 52 Okla.Stat. § 540, whereby plaintiffs pay the proceeds to the producer who assumes responsibility for paying the proceeds to the CLO.

VIII. Declaratory judgment as to the parties' rights and liabilities under the royalty clause of the CLO's oil and gas leases.

IX. Declaratory judgment that House Bill 1110 (64 Okla.Stat. § 293) and Senate Bill 160 (which amended 52 Okla.Stat. §§ 87.1 and 540) are void under Okla. Const. art. 5, § 57, because they each embrace more than one subject.

X. Declaratory judgment (a) that the three statutes are preempted by the Natural Gas Act, 15 U.S.C. §§ 717 et seq. ("NGA") and by the Natural Gas Policy Act, 15 U.S.C. §§ 3301 et seq. ("NGPA") under the Supremacy Clause of the United States Constitution, (b) that the three statutes constitute an undue burden on interstate commerce in violation of the Commerce Clause of the United States Constitution, (c) that Rules 3–150, 3–151, and 3–152 issued by the CLO purporting to govern the valuation of royalties are preempted by the NGA and the NGPA under the Supremacy Clause of the United States Constitution, and (d) the Rules constitute an undue burden on interstate commerce in violation of the Commerce Clause of the United States Constitution.

See Amended Complaint (June 15, 1990) and Second Amended Complaint (Sept. 27, 1990).

IV. *Factual background leading to related proceedings in state court*

The CLO has issued certain Oil & Gas Mining Leases covering one-half the minerals underlying Section 13, Township 12 North, Range 16 West of the Indian Meridian in Custer County, Oklahoma, where a unit well, designated the Meacham 1–13, is located. Plaintiffs are purchasers of gas from the Meacham 1–13. The CLO is a royalty owner.

In 1980 the State of Oklahoma imposed liability on the purchasers of petroleum products to pay royalty payments directly to the mineral owners. 52 Okla.Stat. § 540. The statute provided that the purchaser could exempt itself from this liability by entering into an agreement with the producer such that the producer would assume liability for the royalty payments. In 1987 the State of Oklahoma specifically revoked the provision for exemption of purchasers with respect to royalty payments to the CLO. 64 Okla.Stat. § 293.

On or about November 10, 1988, the office of the State Auditor and Inspector, acting pursuant to 64 Okla.Stat. § 87c, notified the operator of the Meacham 1–13 of potential underpayment of royalties. On August 29, 1989, the auditor's office presented the results of its audit of the Meacham 1–13 to the CLO. On November 27, 1989, the CLO issued Notices of Proposed Cancellation of Oil & Gas Leases and served these plaintiffs with notice. Thereafter, plaintiffs sought a writ of prohibition against the CLO.

On March 26, 1990, the Oklahoma Supreme Court issued the writ and directed the CLO to take the action to the state district court. Two days later, on March 28, 1990, plaintiffs filed this federal court action. On May 7, 1990, the CLO filed its state court action, styled *State of Oklahoma, ex rel. Commissioners of the Land Office v. Northern Natural Gas Company; Internorth, Inc.; Enron Corp.; Anson Corporation; Enron Producing Company; Barrett Drilling Company; CIG Exploration, Inc.; Argosy Corporation; Warlock Petroleum Corporation; Anson Gas Marketing; Producers Gas Company; Northern Natural Gas Company; Sourthern Natural Gas Company; Enron Gas Marketing, Inc.; Northern Gas Marketing, Inc.; Brandywine/Conoco, Inc.; Colorado Interstate Gas Company,* Case No. C–90–109, in the District Court of Custer County, Oklahoma. The state court action is pending.

## V. *Summary of defendants' argument in support of motion to dismiss*

Defendant CLO argues it is the State of Oklahoma for Eleventh Amendment purposes and is therefore immune from suit in federal court.

The individual commissioners acknowledge the Court could exercise jurisdiction over them, individually, under the *Ex parte Young* rationale, but argue the Court should abstain from exercising such jurisdiction because of the pending state court action, because of the unclear questions of state law, and because of the deference accorded to the state courts when the issue involves an overall scheme regulating correlative rights in regulated mineral development.

In addition, all defendants argue Count VIII, which seeks an interpretation of the parties' rights under the royalty clause of the CLO's oil and gas leases, should be dismissed because it is a state claim that has no operative nexus to the other counts asserted in this action.

## VI. *Analysis*

### A. Eleventh Amendment

■ The Eleventh Amendment bars federal jurisdiction over not only the state but also state agencies and departments. *Meade v. Grubbs,* 841 F.2d 1512, 1523 (10th Cir.1988). By contrast, political subdivisions do not enjoy such immunity. *Id.* The test for whether a state agency enjoys immunity is whether it is an arm or instrumentality of the state. *Mount Healthy City School Dist. Board of Educ. v. Doyle,* 429 U.S. 274, 280, 97 S.Ct. 568, 572, 50 L.Ed.2d 471 (1977). In order to make such a determination the Court must consider a number of factors, including the existence, *vel non,* of legislative control over the agency; whether the function the agency performs is one usually performed by state governments as opposed to local governments; and whether the agency is financed through the state treasury, or independently. *See Id.; Lake Country Estates v. Tahoe Regional Planning Agency,* 440 U.S. 391, 402, 99 S.Ct. 1171, 1177, 59 L.Ed.2d 401 (1979); *Meade,* 841 F.2d at 1525; *Unified School District No. 480 v. Epperson,* 551 F.2d 254 (10th Cir.1977), *vacated and remanded on other grounds,* 435 U.S. 948, 98 S.Ct. 1572, 55 L.Ed.2d 797 (1978), *point*

*reiterated on remand,* 583 F.2d 1118 (10th Cir.1978).

■ Applying the above-cited law to the facts of this case, the Court finds the CLO is an arm of the State and is therefore not subject to the jurisdiction of the Court.

First, the grantee of the lands and moneys donated by Congress in the Oklahoma Enabling Act of 1906, and now administered by the CLO, was the state. The Oklahoma Constitution provides that *"the State* is hereby pledged to preserve such lands and moneys...." Okla. Const. art. XI, § 1 (emphasis added). Second, the CLO and the provisions for its legislative rules and regulations were constitutionalized at statehood. Okla. Const. art VI, § 32; *see generally* 64 Okla.Stat. §§ 1–460 (current rules and regulations). Third, the administration of state lands is a state, not a local, function. And finally, the CLO has no authority to levy taxes or incur bonded indebtedness on its own. Okla. Const. art. XI, §§ 1–6; 64 Okla.Stat. § 51.

### B. Ex parte Young

■ In *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), the Supreme Court held that the Eleventh Amendment did not bar a federal court action seeking to enjoin the attorney general of Minnesota from enforcing a statute claimed to violate the Fourteenth Amendment. Under *Ex parte Young* a private individual can sue a state official, acting in his or her official capacity, in federal court, seeking declaratory or injunctive relief against the enforcement of an unconstitutional statute. *Papasan v. Allain,* 478 U.S. 265, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986); *Edwards v. Valdez,* 789 F.2d 1477, 1481 (10th Cir.1986); *Chaloux v. Killeen,* 886 F.2d 247, 257 (9th Cir.1989). Thus, a suit which seeks injunctive or declaratory relief from unconstitutional state action is not a suit against the state for purposes of the Eleventh Amendment, even though the relief may operate against the state itself. *Demery v. Kupperman,* 735 F.2d 1139, 1146 (9th Cir.1984), *cert. denied,* 469 U.S. 1127, 105 S.Ct. 810, 83 L.Ed.2d 803 (1985). To fall within the *Ex parte Young* rationale the state official must have the responsibility for enforcing or administering the state statute alleged to be unconstitutional. Moreover, the relief sought must be prospective in nature, not remedial relief that would serve to compensate a party injured by the past actions of the official. *Papasan,* 478 U.S. at 278, 106 S.Ct. at 2940. *See also* 13 Wright, Miller & Cooper, *Federal Practice and Procedure* § 3524 at 154 (1984) (*"Ex parte Young* ... serves as an effective mechanism for providing relief against unconstitutional conduct by state officers and for testing, in the federal courts, the constitutionality of the state statutes under which they act.").

■ The Court is satisfied that under the *Ex parte Young* doctrine the Court can exercise jurisdiction over the individual commissioners in this case. However, that does not end the question because defendants urge the Court to exercise its discretion to abstain from exercising its jurisdiction.

### C. Abstention

■ As a preliminary matter, federal district courts have discretion whether to entertain actions, such as the instant one, which are brought under the Declaratory Judgments Act. *Brillhart v. Excess Insurance Co.,* 316 U.S. 491, 494–95, 62 S.Ct. 1173, 1175–76, 86 L.Ed. 1620 (1942). The Act provides: "In a case of actual controversy ... [the] court ... *may* declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201 (emphasis added). The use of the word "may" is permissive, not mandatory. *Brillhart,* 316 U.S. at 494–95, 62 S.Ct. at 1175–76. Moreover, the Act clearly expresses the policy to avoid piecemeal litigation. *Id.* As stated by the Supreme Court:

> [I]t would be uneconomical as well as vexatious for a federal court to proceed in a declaratory judgment suit where another suit is pending in a state court presenting the same issues, not governed by federal law, between the same parties. Gratuitous interference with the

orderly and comprehensive disposition of a state court litigation should be avoided. *Id.* at 495, 62 S.Ct. at 1175–76.

Separate and apart from the discretion accorded the Court in the Declaratory Judgments Act is the doctrine of abstention. Abstention is a judge-made doctrine, first fashioned in 1941 in *Railroad Commission of Texas v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), under which federal courts, in the exercise of wise discretion, may abstain from exercising jurisdiction because of "scrupulous regard for the rightful independence of the state governments" and for the smooth working of the federal judiciary. *Id.* at 501, 61 S.Ct. at 645.

Since 1941 the Supreme Court has fashioned four abstention doctrines:

1. *Pullman*-type abstention,[1] to avoid decision of a federal constitutional question where the case may be disposed of on questions of state law;

2. *Burford*-type abstention,[2] to avoid needless conflict with the administration by a state of its own affairs;

3. *Younger*-type abstention,[3] to avoid hearing constitutional challenges to state action where federal action is regarded as an improper intrusion on the right of a state to enforce its own laws in its own courts;

4. *Colorado River*-type abstention,[4] to avoid duplicative litigation.

*See* 17A Wright, Miller & Cooper, *Federal Practice and Procedure* § 4241 at 28, and § 4251 at 180 (2d ed. 1988).

### (1) *Pullman-type abstention*

The mode of analysis to be applied in determining *Pullman*-type abstention was set out in *Vinyard v. King,* 655 F.2d 1016 (10th Cir.1981). There are three prerequisites, as follows:

First, there must be uncertain issues of state law underlying the federal constitutional claims brought in the federal court. Second, these state law issues must be amenable to an interpretation by the state courts that would obviate the need for or substantially narrow the scope of the adjudication of the constitutional claims. And third, it must appear that an erroneous decision of state law by the federal court would be disruptive of important state policies.

*Id.* at 1018. Only after the court determines the case meets these three prerequisites may the court make its discretionary determination as to whether abstention is appropriate. In making its discretionary determination, the court takes into consideration the weight of each of the three prerequisites and "other relevant factors." *Id.*

In *Panhandle Eastern Pipe Line Co., et al. v. State of Oklahoma, ex rel. Commissioners of the Land Office, et al.,* Case No. CIV–85–2659–P, 1988 WL 228562 (W.D. Okla.), this Court had before it a similar constitutional challenge to the 1985 amendments to 52 Okla.Stat. § 87.1 enacted in Senate Bill No. 160. In that case the Court "construed Senate Bill [No.] 160 to operate prospectively only [and therefore did not need to] consider the constitutional questions that might be raised if it were to be applied retrospectively." *See* Order at 4–6 (July 15, 1988). However, the parties in *Panhandle* also challenged the constitutionality of prospective application of the amendments. With respect to that issue, the Court invoked the *Pullman* doctrine and abstained in order to allow the state courts to interpret the amendments. *See* Order at 6–9 (July 15, 1988).

In the instant case the Court again invokes the *Pullman* doctrine. First, there are uncertain issues of state law underlying the three statutes being challenged by plaintiffs. This is perhaps most clearly illustrated by the language of plaintiffs' complaint. Throughout the complaint is found language to the effect that *if* a particular statute is applied retroactively, or *if* a particular statute is applied in such a way

---

**1.** *Railroad Commission of Texas v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941).

**2.** *Burford v. Sun Oil Co.,* 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943).

**3.** *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971).

**4.** *Colorado River Water Conservation District v. United States,* 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976).

as to affect these plaintiffs, then the statute is unconstitutional. *See, e.g.,* Amended Complaint at Counts I, II, III, IV, V, VI, and VII (June 15, 1990). Second, these issues are amenable to an interpretation by the state courts which would obviate the need for, or at least would substantially narrow, the scope of the issues presented in this case. If the state courts interpret the three statutes to operate prospectively only, or interpret the three statutes in such a way that they would not affect these plaintiffs, the issues remaining in this case would be substantially narrower. Third, an erroneous decision of state law by this Court would be disruptive of important state policies.

■ Having determined the three *Pullman* prerequisites are met, the Court must decide whether to exercise its discretion to abstain. In making this determination, the Court places heavy weight not only on the three factors discussed above but also on the following factors. First, under the Declaratory Judgments Act the court has discretion to entertain the action. Second, the same action (or at least a very similar action) is already pending in the state district court of Custer County, Oklahoma. Third, the circumstances under which the state court action was initiated favor abstention. The Oklahoma Supreme Court issued a writ which *directed* the CLO to file the action in state court. However, before the CLO accomplished that task, the plaintiffs filed their initial complaint in this court, challenging one statute, 64 Okla. Stat. § 293. There is no indication plaintiffs, in rushing to federal court, acted in bad faith or for purposes of harassment, but the fact remains that the Oklahoma Supreme Court had already issued its writ.

Accordingly, the Court concludes it should invoke *Pullman*-type abstention and abstain from asserting its jurisdiction in this case.

(2) *Burford-type abstention*

■ Under the *Burford* abstention doctrine, it is appropriate to abstain where the federal case involves difficult questions of state law that bear on policy problems of substantial public import whose importance transcends the result in the federal case.

*Colorado River Water Conservation District v. United States,* 424 U.S. 800, 814, 96 S.Ct. 1236, 1244, 47 L.Ed.2d 483 (1976); *see also Walker Operating Corp. v. F.E.R.C.,* 874 F.2d 1320, 1330 (10th Cir.1989) (*"Burford*-type abstention is deference by a federal court in order to avoid needlessly interfering in state activities"); *Railroad Comm'n of Texas v. F.E.R.C.,* 874 F.2d 1338, 1342 (10th Cir.1989); *ANR Pipeline Co. v. Corporation Comm'n of Oklahoma,* 860 F.2d 1571, 1579–80 (10th Cir. 1988). However, the issues of state law need not be determinative of the state policy. "It is enough that exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern." *Colorado River,* 424 U.S. at 814, 96 S.Ct. at 1245. For example, in *Burford,* the United States Supreme Court held that the district court should have dismissed a case that challenged the reasonableness of a Texas state commission's permit to drill oil wells. The Supreme Court noted Texas had established its own elaborate review system for dealing with the geological complexities of oil and gas fields. The Supreme Court further noted that while the reasonableness of the permit was not of transcendent importance, the review of such reasonableness by the federal court in that and future cases would have an impermissibly disruptive effect on state policy for the management of the state's oil and gas fields. *Burford v. Sun Oil Co.,* 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943).

Generally, *Burford*-type abstention is not appropriate where a preemption claim is well-founded, because in such cases "the basic premise of abstention—avoiding needless federal court intervention into important matters within the state's jurisdiction to regulate—obviously is lacking." *American Petrofina Co. of Texas v. Nance,* 859 F.2d 840, 842 (10th Cir.1988) (quoting *Aluminum Co. v. Utilities Comm'n,* 713 F.2d 1024, 1030 (4th Cir. 1983), *cert. denied,* 465 U.S. 1052, 104 S.Ct. 1326, 79 L.Ed.2d 722 (1984)); *but see New Orleans Public Service, Inc. v. Council of*

*City of New Orleans,* 491 U.S. 350, 373, 109 S.Ct. 2506, 2521, 105 L.Ed.2d 298 (1989) (Rehnquist, concurring); *Brotherhood of Locomotive Engineers v. Massachusetts Comm'n Against Discrimination,* 695 F.Supp. 1321 (D.Mass.1988). Thus, the Court now directs its attention to plaintiffs' preemption claim.

■ There are two general ways state law can be preempted. If Congress evidences its intent to occupy an entire field, then any state law falling within that field is preempted. If Congress has not entirely occupied a given field, then a particular state law is preempted only if it and to the extent it actually conflicts with federal law. *ANR Pipeline Co. v. Corporation Comm'n of Oklahoma,* 860 F.2d 1571, 1580 (10th Cir.1988) (citing *Silkwood v. Kerr–McGee Corp.,* 464 U.S. 238, 248, 104 S.Ct. 615, 621, 78 L.Ed.2d 443 (1983)). It is the second type of preemption that is at issue here.

■ Plaintiffs argue the three challenged statutes are preempted by the Natural Gas Act ("NGA"), 15 U.S.C. §§ 717 et seq., and the Natural Gas Policy Act ("NGPA"), 15 U.S.C. §§ 3301 et seq. The NGA and NGPA were also at issue in *ANR Pipeline,* and the Tenth Circuit concisely described the acts as follows:

> Under the [Natural Gas Act], the Federal Power Commission's comprehensive regulatory scheme involved "utility-type ratemaking" control over prices and supplies.... "[I]n the early 1970's, it became apparent that the regulatory structure was not working."
>
> \* \* \* \* \* \*
>
> In response, Congress enacted the [Natural Gas Policy Act], which "has been justly described as 'a comprehensive statute to govern future natural gas regulation.'" ... The aim of federal regulation remains to assure adequate supplies of natural gas at fair prices, but the [Natural Gas Policy Act] reflects a congressional belief that a new system of natural gas pricing was needed to balance supply and demand. The new fed-

eral role is to "overse[e] a national market price regulatory scheme."

*ANR Pipeline,* 860 F.2d at 1580 (citations omitted).

The Oklahoma statutes that are being challenged in the instant case do not deal with supply and demand or with any market pricing scheme. They simply purport to impose upon gas purchasers, rather than upon gas producers, the liability for making royalty payments to the royalty owners.[5] Accordingly, the Court finds the challenged statutes are not preempted by the NGA and the NGPA.

Finding no preemption, the Court now returns to its consideration of *Burford*-type abstention.

■ The State of Oklahoma, like the State of Texas, has established an elaborate system for dealing with the regulation of the oil and gas industry and the state courts are well-equipped to deal with such issues. *See, e.g.,* 52 Okla.Stat. §§ 1–614 (Oil and Gas). The Court believes its refusal to abstain in this case would be disruptive to the State of Oklahoma's policies for the management and regulation of the oil and gas industry.

Accordingly, the Court finds that abstention is proper under not only the *Pullman* doctrine but also under the *Burford* doctrine.

### (3) *Younger-type abstention*

■ *Younger*-type abstention originally was limited to cases in which federal jurisdiction was invoked for the purpose of restraining state criminal proceedings, state nuisance proceedings antecedent to criminal prosecution, or collection of state taxes. However, the doctrine has evolved to include civil proceedings in which "the State's interests in the proceeding are so important that exercise of the federal judicial power would disregard the comity between the States and the National Government." *Pennzoil Co. v. Texaco, Inc.,* 481

---

**5.** The Court acknowledges this is an oversimplification of the statutes, but believes the oversimplification is warranted in order to emphasize that the statutes do not purport to regulate supply and demand or the pricing of gas or oil.

U.S. 1, 11, 107 S.Ct. 1519, 1526, 95 L.Ed.2d 1 (1987).

In the *Pennzoil* case, Pennzoil had obtained an eleven billion dollar judgment against Texaco in Texas state court. Under Texas law, the only way Texaco could prevent enforcement of the judgment pending appeal was to post a bond for approximately thirteen billion dollars, which Texaco could not do. Texaco then brought a civil rights action in federal court arguing that the application of Texas law would deny it the right to appeal and would therefore violate its rights under the due process and equal protection clauses of the Fourteenth Amendment. Both the federal district court and the Second Circuit agreed with Texaco, but the Supreme Court reversed and ordered the federal action dismissed under the principles of federalism enunciated in *Younger*. *See generally* 17A Wright, Miller & Cooper, *Federal Practice and Procedure* § 4254 at 245–46 (2d ed. 1988). In *Pennzoil* the Supreme Court recognized abstention is proper in cases that involve the processes by which a state compels compliance with the judgments of its courts. *Pennzoil*, 481 U.S. at 13–14, 107 S.Ct. at 1527–28; *see also, Myers v. Garff*, 876 F.2d 79, 81 (10th Cir. 1989).

The Supreme Court has set out a three-part test to be used when determining whether to invoke *Younger*-type abstention: (1) there must be an ongoing state court proceeding; (2) the state court proceeding must implicate important state interests; and (3) there must be an adequate opportunity in the state proceeding to raise constitutional challenges. *Middlesex County Ethics Committee v. Garden State Bar Association*, 457 U.S. 423, 431–32, 102 S.Ct. 2515, 2520–21, 73 L.Ed.2d 116 (1982); *Seneca–Cayuga Tribe of Oklahoma v. State of Oklahoma ex rel. Thompson*, 874 F.2d 709, 711 (10th Cir. 1989). If these three conditions are met, *Younger* abstention is mandatory absent extraordinary circumstances that render the state court unable to fairly hear the litigants' federal claims. *Seneca–Cayuga Tribe*, 874 F.2d at 711.

Applying the law to the facts of the instant case, the Court concludes *Younger*-type abstention is warranted. There is ongoing state court proceeding in the district court of Custer County, Oklahoma. The state court proceeding implicates important state interests, namely, the state's regulation of the state's oil and gas industry, and this is one of the traditional areas of state concern in which abstention has been held to be proper. *See Seneca–Cayuga Tribe*, 874 F.2d at 713 (citing *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 107 S.Ct. 1519, 95 L.Ed.2d 1 (1987) (execution of state court judgment); *Ohio Civil Rights Commission v. Dayton Christian Schools*, 477 U.S. 619, 106 S.Ct. 2718, 91 L.Ed.2d 512 (1986) (sex discrimination); *Middlesex County Ethics Committee v. Garden State Bar Association*, 457 U.S. 423, 102 S.Ct. 2515, 73 L.Ed.2d 116 (1982) (professional conduct of lawyers); *Moore v. Sims*, 442 U.S. 415, 99 S.Ct. 2371, 60 L.Ed.2d 994 (1979) (family relations child welfare); *Trainor Hernandez*, 431 U.S. 434, 97 S.Ct. 1911, 52 L.Ed.2d 486 (1977) (state welfare program); *Juidice v. Vail*, 430 U.S. 327, 97 S.Ct. 1211, 51 L.Ed.2d 376 (1977) (state contempt proceedings); *Huffman v. Pursue Ltd.*, 420 U.S. 592, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975) (local nuisances); and *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971) (state criminal proceedings)). Finally, the litigants have an adequate opportunity to raise their constitutional challenges in the state court proceeding.

Accordingly, the Court concludes it is proper to abstain not only under the *Pullman* and *Burford* doctrines but also under the principles of federalism enunciated in *Younger*.

### (4) *Colorado River-type abstention*

■ In *Colorado River Water Conservation District v. United States*, 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976), the Supreme Court conferred legitimacy on the practice of dismissing a federal action on the sole ground that there is a similar action pending in state court in which the controversy between the parties can be resolved. The Court cautioned, however, that such a practice should be limited to exceptional cases. The Court stated:

[T]here are principles unrelated to considerations of proper constitutional adjudication and regard for federal-state relations which govern in situations involving the contemporaneous exercise of concurrent jurisdictins, either by federal courts or by state and federal courts. These principles rest on considerations of "[w]ise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation."

Generally, as between state and federal courts, the rule is that "the pendency of an action in the state court is no bar to proceedings concerning the same matter in the federal court having jurisdiction...." As between federal district courts, however, though no precise rule has evolved, the general principle is to avoid duplicative litigation.

This difference in general approach ... stems from the virtually unflagging obligation of the federal courts to exercise the jurisdiction given them. Given this obligation ... the circumstances permitting the dismissal of a federal suit due to the presence of a concurrent state proceeding for reasons of wise judicial administration are considerably more limited than the circumstances appropriate for abstention. The former circumstances, though exceptional, do nevertheless exist.

*Colorado River*, 424 U.S. at 817–18, 96 S.Ct. at 1246 (citations omitted). There are several factors to be considered in determining whether a case fits into the "exceptional circumstances" category. These include: which court first assumed jurisdiction; whether the federal forum is inconvenient; what law applies; the desirability of avoiding piecemeal litigation; and whether the cases are *in rem* and involve the same property. *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. 1, 15, 103 S.Ct. 927, 936, 74 L.Ed.2d 765 (1983). Other factors include the adequacy of the state court proceedings to protect the parties' rights and whether the attempt to invoke federal jurisdiction was in bad faith. *Life–Link International, Inc. v. Lalla*, 902 F.2d 1493, 1495 (10th Cir.1990). "No one factor is

necessarily determinative; a carefully considered judgment taking into account both the obligation to exercise jurisdiction and the combination of factors counselling against that exercise is required. Only the clearest of justifications will warrant dismissal." *Colorado River*, 424 U.S. at 818–19, 96 S.Ct. at 1247 (citation omitted).

■ Applying the law to the facts of the instant case, the Court is not convinced that it could dismiss the case under the principles of *Colorado River*. Factors weighing in favor of dismissal include the desire to avoid piecemeal litigation, that Oklahoma law will apply to determine the application of the challenged statutes, and the circumstances under which federal jurisdiction was invoked. However, several factors weigh more heavily in favor of declining to dismiss under *Colorado River*. Those factors include the fact that this court assumed jurisdiction some six weeks before the state court action was filed, there is no evidence the federal forum is inconvenient, the state court action is apparently still in the early stages of litigation, and the recognition of the "virtual unflagging obligation of the federal courts to exercise the jurisdiction given them." *Colorado River*, 424 U.S. at 817, 96 S.Ct. at 1246. Accordingly, the Court concludes dismissal under *Colorado River* would not be proper.

### D. Count VIII

In view of the Court's decision to abstain from exercising its jurisdiction in this case, under the doctrines of *Pullman, Burford,* and *Younger*, it is unecessary to address defendants' alternative argument that Count VIII, seeking the Court's interpretation of the parties' respective rights under the CLO's oil and gas leases, should be dismissed.

### E. Retention of the case

■ It is the better practice, in a case raising a federal constitutional question, to retain jurisdiction rather than to dismiss the case. *Zwickler v. Koota*, 389 U.S. 241, 244 n. 4, 88 S.Ct. 391, 393 n. 4, 19 L.Ed.2d 444 (1967); *Vinyard v. King*, 655 F.2d

1016, 1018 n. 3 (10th Cir.1981). Accordingly, the Court will retain jurisdiction of this case for final disposition pending resolution of the concurrent state court proceedings. The parties shall advise the Court of the status of the state court proceedings on a quarterly basis, as set out below.

## VI.  *Conclusion*

Defendants' June 15, 1990, motion to dismiss the amended complaint and defendants' September 27, 1990, motion to dismiss the second amended complaint are GRANTED IN PART AND DENIED IN PART as follows:

A.  Plaintiffs' preemption claim is dismissed with prejudice;

B.  The Court abstains from deciding the remaining claims in plaintiffs' second amended complaint;

C.  The Court retains jurisdiction over the case for final disposition, pending resolution of the concurrent state court proceedings;

D.  The parties shall submit to the Court's chambers a joint status report in the case every three months beginning April 1, 1991, which report shall inform the Court of the status of the state court proceedings.  The report shall be in the form of a letter to the Court, shall be no longer than three (3) typewritten pages and shall be signed by counsel for both parties.  After reviewing the letters, the Court will have them placed in the file maintained by the Court Clerk;  and

E.  This case is administratively closed, to be reopened by application of the parties upon the resolution of the concurrent state court proceedings.

IT IS SO ORDERED.